IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

CAROL A. and ROY E. STANLEY                                        PLAINTIFFS

v.                                        Case No. 5:14-CV-05236

UNITED STATES OF AMERICA                                        DEFENDANT

## ORDER

Currently before the Court are cross motions for summary judgment (Docs. 21, 24).  Also

before the Court are the parties' responsive filings, and various exhibits in support.  After reviewing

the filings, the Court previously found that there was no genuine dispute of any material fact such

that this case should be presented to a jury.  (Doc. 47).  The Court directed the parties to submit

additional briefs specifically addressing certain questions raised by the Court in its order.  Those

supplemental briefs (Docs. 51 and 53) have now been filed and reviewed by the Court.  The Court

also heard additional argument and received evidence at a hearing held on September 29, 2015.  At

the hearing, the Court heard testimony from Scott Rogerson and Roy Stanley.  Having reviewed the

parties filings and considered the argument, testimony, and evidence of record, the Court finds that

the Stanleys' motion for summary judgment (Doc. 21) should be GRANTED and the Government's

motion for summary judgment (Doc. 24) should be DENIED.

## I.      Background

Carol A. and Roy E. Stanley filed the complaint in this case on July 25, 2014 asserting a

claim pursuant to 26 U.S.C. § 7422 for the refund of money paid to the Internal Revenue Service

("IRS").  For tax years 1994 through 2010, the Stanleys filed joint federal income tax returns.  As

is relevant to this matter, the Stanleys reported certain non-passive income and losses on Schedule

-1-

E's on their 2009 and 2010 returns.  Before the IRS began its examination of the Stanleys' 2009 and 2010 returns, the Stanleys had paid all their reported tax liabilities in full.  On October 2, 2012, Luke Pearson, an examiner with the Fayetteville, Arkansas office of the IRS, issued a report containing his findings resulting from an audit of the Stanleys' 2009 and 2010 returns.  Mr. Pearson found that a significant portion of the income the Stanleys claimed as non-passive should be reclassified as passive income, resulting in an increase in the Stanleys' tax liability for those years.  The Stanleys appealed Mr. Pearson's findings to the Oklahoma City IRS appeals office.  Ultimately, the IRS made adjustments to the Stanleys' 2009 and 2010 returns resulting in an increase in taxes and interest owed of $69,851.08 for 2009 and $52,290.76 for 2010.  The Stanleys paid the additional taxes assessed under protest and filed claims for refunds.  The IRS has not acted on the Stanleys' refund claims, and the issues are now before this Court.

From 1978 to February 1, 1994, Roy Stanley ("Roy") practiced law in Springdale, Arkansas, primarily representing real-estate clients and financial institutions.  On February 1, 1994, Roy began working full time as President of Lindsey Management Co., Inc., ("LMC"), a property-management company based in Fayetteville, Arkansas.  By 2009 and 2010, Roy worked half time at LMC.  Between February 1, 1994, and August 14, 2009, Roy also acted as general counsel for LMC.  In 2008 or 2009, Roy's title at LMC became President Emeritus, and on December 31, 2010, Roy retired from LMC.  Starting in November 1996, and during the relevant time period, Roy also served as President of Lindsey Communications, Inc. ("LCI"), a company that provided telecommunications services to certain properties managed by LMC.

From the beginning of Roy's employment with LMC, the Stanleys acquired minority ownership interests in business entities that owned or operated the rental properties and adjoining

Case 5:14-cv-05236-PKH   Document 60   Filed 11/12/15   Page 3 of 25 PageID #: 1991

golf courses managed by LMC. By 2009 and 2010, the Stanleys had an ownership interest in more than 100 entities. The Stanleys also directly owned two rental properties, two percent of a third rental property, and interests in 88 (in 2010) and 90 (in 2009) additional entities through the Roy E. Stanley Family Limited Partnership. For 2009 and 2010, the Stanleys reported all income and losses resulting from these ownership interests as non-passive on their Schedule E's. When the IRS audited the Stanleys' 2009 and 2010 returns, it reclassified all of the Schedule E income and losses (except for those related to Roy's income from LMC) as passive, which resulted in the Stanleys owing additional taxes for those years, as they were not able to use passive losses to offset non-passive income.

The Stanleys claim that the IRS's actions in regrouping their Schedule E activities and in reclassifying claimed non-passive activity as passive were in error and that the resulting additional owed taxes were wrongfully assessed. Specifically, the Stanleys assert that for tax years 2009 and 2010: (1) Roy was a qualifying taxpayer or "real estate professional," as he met the requirements set out in 26 U.S.C. § 469(c)(7); (2) the Stanleys' rental real estate activities and business activities could be grouped pursuant to 26 C.F.R. § 1.469-4(d)(1), as the rental and business activities constituted an appropriate economic unit, and the business activities were insubstantial in relation to the rental activities and/or each owner of the business activities had the same proportionate ownership interest in the rental activities; (3) the Stanleys appropriately aggregated their rental real estate activities pursuant to 26 C.F.R. § 1.469-9(g); and (4) the aggregated rental real estate activities together with the grouped business activities should be non-passive, as Roy materially participated in the grouped "Activity" in accordance with the criteria set forth in 26 C.F.R. § 1.469-5T(a). The Stanleys seek a refund of $69,501.08 with respect to their 2009 federal income tax return and

-3-

$52,290.76 with respect to their 2010 federal income tax return plus interest from the date of payment and costs incurred in bringing this action.

The Government, in turn, argues that (1) Roy was not a 5% owner of LMC as would be required for his services performed as an employee of LMC to constitute material participation in a real property trade or business as set forth in 26 U.S.C. § 469(c)(7)(D)(ii) and 26 C.F.R. § 1.469-9(c)(5); (2) Roy did not qualify as a real estate professional; (3) the Stanleys' Schedule E activities were not appropriately grouped; (4) Roy did not materially participate in an appropriately grouped activity as required to show non-passive income or loss; and (5) Roy has, in any event, not adequately substantiated that (a) he was a 5% owner in LMC, (b) he qualified as a real estate professional, (c) he appropriately grouped rental activities with non-rental activities, or (d) he materially participated in any appropriately grouped activity. The Government seeks a judgment declaring that the Stanleys are not entitled to a refund because the IRS appropriately re-characterized the Stanleys' Schedule E activities as passive for tax years 2009 and 2010.

## II.   Analysis

The standard of review for summary judgment is well established. Under Federal Rule of Civil Procedure 56(a), "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The moving party bears the burden of proving the absence of a genuine dispute of material fact and that it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986); *Nat'l. Bank of Commerce of El Dorado, Ark. v. Dow Chem. Co.*, 165 F.3d 602 (8th Cir. 1999). When the moving party has met its burden, the non-moving party must "come forward with 'specific facts showing that there is a genuine issue for

-4-

trial.'" *Matsushita*, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(c)).  This same standard applies where, as here, the parties file cross motions for summary judgment.  In this situation, it follows that when the parties agree that there exists no genuine issue as to any material fact, "summary judgment is a useful tool whereby needless trials may be avoided, and it should not be withheld in an appropriate case." *United States v. Porter*, 581 F.2d 698, 703 (8th Cir. 1978).  Each motion should be reviewed in its own right, with each side, respectively, "entitled to the benefit of all inferences favorable to them which might reasonably be drawn from the record." *Wermager v. Cormorant Twp. Bd.*, 716 F.2d 1211, 1214 (8th Cir. 1983).  "Questions of law are 'particularly appropriate for summary judgment.'" *Hammer v. Sam's East, Inc.*, 754 F.3d 492, 501 (8th Cir. 2014) (quoting *TeamBank, N.A. v. McClure*, 279 F.3d 614, 617 (8th Cir. 2002)).

"Generally, the I.R.S. determination on the existence of a tax deficiency is presumed correct; thus, the taxpayer generally bears the burden of proving entitlement to a claimed deduction by a preponderance of the evidence."  *Blodgett v. C.I.R.*, 394 F.3d 1030, 1035 (8th Cir. 2005).  The burden may, however, shift to the IRS in certain circumstances.  *Id*.  Because the issues before the Court turn on questions of law—to include questions as to what substantiation is required of a taxpayer under the law—the issue of who has the burden of factual proof is largely immaterial in this case, which the Court has found appropriate to decide on summary judgment.  Where, however, the Court has found that the Stanleys have failed to present evidence on an issue, the Court has held them to their burden.

## A.    Roy Stanley was a more-than-five-percent owner of LMC.

As a threshold matter, the Court must determine whether Roy was at least a five-percent owner of LMC such that his services performed as an employee of LMC can be treated as performed

in a real property trade or business for purposes of determining if Roy was a "qualifying taxpayer" for purposes of 26 U.S.C. § 469(c)(7).  Generally, "personal services shall not be treated as performed in real property trades or businesses." 26 U.S.C. § 469(c)(7)(D)(ii).  That restriction will not apply, however, "if such employee is a 5-percent owner (as defined in section 416(i)(1)(B)) in the employer."  *Id*.  Section 416(i)(1)(B)(i) defines a "5-percent owner" as follows:

> (I)     if the employer is a corporation, any person who owns (or is considered as owning within the meaning of section 318) more than 5 percent of the outstanding stock of the corporation or stock possessing more than 5 percent of the total combined voting power of all stock of the corporation, or

> (II)    if the employer is not a corporation, any person who owns more than 5 percent of the capital or profits interest in the employer.

26 U.S.C. § 416(i)(1)(B)(i)(I)-(II).

The Government first argued that any income Roy received as a portion of LMC's profits was more properly characterized as direct salary income and was not indicative of ownership in the company.  Roy testified that, from the time he began working at LMC in 1994, he owned ten percent of the company.  Roy admitted into evidence a stock certificate evidencing his ownership of 10 shares out of 100 shares of LMC stock issued.  (Pl. Hearing Exh. 6).  Scott Rogerson, Chief Financial Officer and President of Corporate Operations for LMC, testified that the certificate was in fact a stock certificate from LMC to Roy for ten shares of stock in LMC.  (Doc. 59, p. 9).   Mr. Rogerson testified that the stock certificate issued to Roy was restricted only by the terms of the Roy's employment agreement with LMC.  (Doc. 59, p. 9).  Roy testified under oath that his stock in LMC was voting stock, but that meetings of the 2 or 3 shareholders at LMC were informal and that, with only ten percent of the stock, his role was to give advice as opposed to making decisions. *Id*. at 27, 55.  Roy's ownership of the stock was acknowledged in his February 1, 2004 employment

agreement and a subsequent employment agreement, which memorialized the understanding between the parties to those agreements that Roy would relinquish his stock upon full retirement from LMC. (Doc. 57, pp. 7 and 10).  Roy's salary from LMC was reported as W-2 income from wages or salaries on line 7 of the Stanleys' tax returns for 2009 and 2010.  (Doc. 50-4, p. 3 and Doc. 50-5, p. 3).  Income received as a result of Roy's 10-percent ownership interest in LMC was reported on a Form K-1 from LMC each year and reported on Schedule E of the returns as distributions from an S corporation.  (Doc. 50-4, p. 59 and Doc. 50-5, p. 61).  Upon his resignation from LMC, and pursuant to his employment agreement with LMC, Roy transferred the stock certificate back to James Edgar Lindsey.  (Pl. Hearing Exh. 7).  While the Government argues that this evidence is not sufficient to substantiate Roy's alleged ownership, the Court finds that it is sufficient to show that Roy held ten percent of the stock of LMC for tax years 2009 and 2010.  While the Court construes this as a legal issue of what may constitute or substantiate ownership under the applicable regulation, in the event it may be construed as an issue of evidentiary sufficiency, the Court finds that Roy has shown his ownership by a preponderance of the evidence.

The parties dispute whether Roy bore any risk of loss were LMC to experience a loss during Roy's tenure.  This argument, however, does not factor into the Court's analysis, as it is rooted in speculation.  LMC never experienced a loss during Roy's tenure.  Rather, the issue here is whether Roy has adequately and reasonably substantiated his ownership for purposes of the tax code.  The Court finds that he has.  Furthermore, the fact that Roy did not make a capital contribution for his shares is not determinative of whether he nevertheless owned 10 percent of the stock of LMC.  A capital contribution is merely one avenue of acquiring ownership of stock or other property.

In the alternative to arguing that Roy's income from his alleged ten-percent ownership in LMC was salary income, the Government argued that Roy's stock in LMC was not "outstanding stock" as required by 26 U.S.C. § 416(i)(1)(B)(i)(I).  Section 416(i)(1)(B)(i) defines a "5-percent owner," in the case of corporate employer, as "any person who owns (or is considered as owning within the meaning of section 318) more than 5 percent of the outstanding stock of the corporation or stock possessing more than 5 percent of the total combined voting power of all stock of the corporation."  Section 318 in turn provides that, at least for purposes of subsection (a)(5) of that statute, "an S corporation shall be treated as a partnership, and any shareholder of the S corporation shall be treated as a partner of such partnership."  26 U.S.C. § 318(a)(5)(E)(i)-(ii).  Going back to subsection 416(i)(1)(B)(i)(II), if an employer is not a corporation, a 5-percent owner is defined as "any person who owns more than 5 percent of the capital or profits interest in the employer."

LMC is an S corporation.  The Government argues that, therefore, it is a corporate employer, and Roy is required, pursuant to 26 U.S.C. § 416(i)(1)(B)(i)(I), to have owned 5 percent of the "outstanding stock" of LMC for tax years 2009 and 2010 for him to count his work as an employee of LMC towards the participation required to be a real estate professional.  The Government argues that Roy's stock was restricted in that he was required to surrender it, pursuant to his employment agreement with LMC, either at the end of his employment or five years after his disability or death. The Government argued that, because of this restriction, Roy could not transfer his stock to anyone other than back to LMC or to James E. Lindsey.

Roy argues that, although LMC is a corporation, because it is an S corporation, it should actually be treated as a partnership for purposes of determining if he was a 5-percent owner of LMC,

pursuant to 26 U.S.C. § 318(a)(5)(E).[1]  Roy argues that, under section 318, as a shareholder of LMC, he should be treated as a partner of the LMC "partnership" and he was, therefore, a 5-percent owner of LMC as he owned more than 5 percent of the capital or profits interest in his employer, LMC as required by 26 U.S.C. § 416(i)(1)(B)(i)(II).  Alternatively, Roy argues that he did own at least 5 percent of the outstanding stock of LMC as required by 26 U.S.C. § 416(i)(1)(B)(i)(I), as evidenced by his stock certificate and other evidence before the Court.

In advancing its argument that Roy did not own "outstanding" stock, the Government relies on an unrelated section of the tax code, 26 U.S.C. § 83.  Section 83 provides guidance for when a taxpayer should report gross income for property received in connection with the performance of services.  "If, in connection with the performance of services, property is transferred to any person other than the person for whom such services are performed," Section 83 requires the person performing the services to report as gross income the fair market value of the property over the amount paid for the property "in the first taxable year in which the rights of the person having the beneficial interest in such property are transferable or are not subject to a substantial risk of forfeiture, whichever is applicable." 26 U.S.C. § 83(a).  Section 83 does not explicitly reference any provisions of the code or regulations at issue in this case.  The Government has not cited to any authority that would require or allow application of Section 83 to 26 U.S.C. § 416(i)(1)(B)(i)(I), and the Court has not otherwise found any such authority.  At the hearing, counsel for the Government argues that Section 83 was relevant to the issues in this case simply because it is entitled "Property Received in Connection with the Provision of Services."  (Doc. 59, p. 95).  The mere title of a

---

[1] Section 318 provides, at least for purposes of subsection (a)(5) of that statute, that "an S corporation shall be treated as a partnership, and any shareholder of the S corporation shall be treated as a partner of such partnership." 26 U.S.C. § 318(a)(5)(E)(i)-(ii).

section of the tax code does not act as a net that might ensnare any other provision falling within its broad subject-matter reach.  The purpose of Section 83 appears to be to provide guidance on when a taxpayer should report certain property received in exchange for services (i.e. stock options) as gross income on a tax return, and further provides taxpayers with the option to elect to include such property in gross income in the year of transfer notwithstanding any restriction on its transferability or any substantial risk of forfeiture.  26 U.S.C. § 83(b).  The Court finds that the section provides no authoritative, or even persuasive, guidance on the issue of whether Roy was a 5-percent owner of LMC.

The Court further finds that it is immaterial to this case whether LMC should be treated as a corporation or a partnership for purposes of 26 U.S.C. § 416(i)(1)(B)(i).  If LMC is treated as a corporation, the Court finds that Roy has shown he owned 10 percent of the "outstanding stock." The Court has already set out the evidence of record substantiating Roy's ownership of the stock, and the Court does not find that the word "outstanding" imposes some additional requirement that the stock be readily transferable or not at risk of forfeiture that would operate to prevent Roy from claiming ownership for purposes of 26 U.S.C. § 469(c)(7)(D)(ii).  Rather, Roy owned 10 shares of 100 shares of stock issued by LMC.  Therefore, in the ordinary understanding of the term, Roy owned 10 percent of outstanding LMC stock.[2]  Furthermore, Roy argues that his interest in the stock (an interest that was subject to being surrendered upon the occurrence of certain events, such as Roy leaving LMC's employment) would have been transferable, and the Government has not persuaded the Court that Roy's argument is incorrect.  If, alternatively, LMC should be treated as a partnership

---

[2] *See* www.investopedia.com/terms/o/outstandingshares.asp ("Outstanding shares refer to a company's stock currently held by all its shareholders, including share blocks held by institutional investors and restricted shares owned by the company's officers and insiders.").

for purposes of 26 U.S.C. § 416(i)(1)(B)(I), the Court finds that Roy has substantiated that he "own[ed] more than 5 percent of the capital or profits interest in the employer" as required.  In either event, the Court finds that Roy was a ten-percent owner of LMC for purposes of 26 U.S.C. § 469(c)(7)(D)(ii).

**B.    Roy Stanley was a qualifying taxpayer pursuant to 26 U.S.C. § 469(c)(7).**

By rule, all rental activity is per se passive under the tax code.  26 U.S.C. § 469(c)(2) ("Except as provided in paragraph (7), the term 'passive activity' includes any rental activity.").  The per se passive rule does not apply, however, to any rental real estate activity of a taxpayer for a taxable year if the taxpayer can show that "(i) more than one-half of the personal services performed in trades or businesses by the taxpayer during such taxable year are performed in real property trades or businesses in which the taxpayer materially participates, and (ii) such taxpayer performs more than 750 hours of services during the taxable year in real property trades or businesses in which the taxpayer materially participates." 26 U.S.C. § 469(c)(7)(B).  In common parlance, the per se passive rule does not apply to a taxpayer who satisfies the two requirements listed above and therefore qualifies as a "real estate professional."  For real estate professionals, a rental real estate activity is a passive activity unless the qualifying taxpayer materially participates in the activity (in other words, the general rules for passive activity apply instead of the per se passive rule).  26 C.F.R. § 1.469-9(e).  For purposes of determining whether a taxpayer qualifies as a real estate professional, "real property trade or business" includes any real property management trade or business.  26 U.S.C. § 469(c)(7)(C).  "[P]ersonal services performed as an employee shall not be treated as performed in real property trades or businesses" unless "such employee is a 5-percent owner . . . in the employer." 26 U.S.C. § 469(c)(7)(D)(ii).

-11-

As set forth above, the Court has already found that Roy was a 10-percent owner of LMC during the relevant time period of tax years 2009 and 2010. It is undisputed that Roy spent over half of his working time performing services for LMC, as Roy had no employment other than his employment at LMC. It is also undisputed that Roy performed more than 750 hours of services as an employee of LMC in 2009 and 2010.[3] It is undisputed that LMC is a real property management business. Roy also materially participated in LMC for tax years 2009 and 2010, as he spent more than 500 hours participating in the activity during each year. 26 C.F.R. § 1.469-5(a)(1) and (f)(1). The Government argues that, in order for Roy to substantiate his claim that he was a real estate professional, he "needed to keep track of time spent using a minimum of two categories:activities in real property trades or businesses and activities not in real property trades or businesses, such as the provision of legal services." (Doc. 37, p. 6). Section 469 does not, however, require that the services performed in a real property trade or business be of any specific character or that all such services must be directly related to real estate. Rather, the services must simply be performed "in real property trades or business in which the taxpayer materially participates." 26 U.S.C. § 469(c)(7)(B)(i) and (ii). Because LMC was a real property business in which Roy materially participated, Roy satisfied the requirements of 26 U.S.C. § 469(c)(7) and was properly considered a real estate professional for tax years 2009 and 2010.

**C.    Roy Stanley appropriately aggregated his rental activities pursuant to 26 C.F.R. § 1.469-9(g) and, with certain exceptions, appropriately grouped his rental and non-rental activities pursuant to 26 C.F.R. § 1.469-4.**

---

[3] The parties stipulated that Roy's time spent working for LMC/LCI in 2009 and 2010 averaged between 28.25 and 29.25 hours per week (Doc. 26-4, ¶¶ 70-71).

"Each interest in rental real estate of a [real estate professional taxpayer] will be treated as a separate rental real estate activity, unless the taxpayer makes an election . . . to treat all interests in rental real estate as a single rental real estate activity."  26 C.F.R. § 1.469-9(e)(1).  The Stanleys made the appropriate election to aggregate their rental real estate activities, pursuant to 26 C.F.R. § 1.469-9(g), for tax years 2009 and 2010.

The Government does not dispute that the Stanleys properly aggregated their rental real estate activities (except insofar as they argue that Roy was not a real estate professional who qualified to aggregate his rentals pursuant to 26 C.F.R. § 1.469-9(g)—an argument the Court has already rejected).  The Government does, however, argue that the Stanleys could not group their aggregated "Rental Activity" with any other non-rental activity, because such grouping is categorically prohibited by 26 C.F.R. § 1.469-9(e)(3)(i).  Subsection 1.469-9(e)(3)(i) is entitled "Grouping rental real estate activities with other activities—In general" and provides as follows:

> *For purposes of this section*, a qualifying taxpayer may not group a rental real estate activity with any other activity of the taxpayer.  For example, if a qualifying taxpayer develops real property, constructs buildings, and owns an interest in rental real estate, the taxpayer's interest in rental real estate may not be grouped with the taxpayer's development activity or construction activity.  *Thus*, only the participation of the taxpayer with respect to the rental real estate may be used *to determine if the taxpayer materially participates in the rental real estate activity* under § 1.469-5T.

(emphases added).  The Court cannot agree with the Government's interpretation that this section categorically prohibits real estate professionals from grouping rental activity with other activity for all purposes.  While this particular argument was not raised in the parties' original briefs, the Court requested briefing on the issue of whether subsection 1.469-9(e)(3)(i) "prohibit[s] grouping of rental real estate activities (whether singular or aggregated) with non-rental real estate activities for purposes of determining material participation in the rental real estate activity."  (Doc. 56, p. 2).

-13-

Implicit in that question was the Court's initial understanding that 1.469-9(e)(3)(i) likely limited grouping but only for purposes of determining material participation in a rental activity. The Government's arguments in its supplemental brief and at the hearing did not convince the Court that its initial understanding was wrong. Read in context, subsection 1.469-9(e)(3)(i) bars grouping only for purposes of determining material participation and does not categorically bar a real estate professional from grouping rental and non-rental activities for other purposes, including for purposes of determining passive activity loss and credit.

First, subsection 1.469-9(e)(3)(i) is self-limiting, as it begins with the words, "for purposes of this section." "This section" refers to 1.469-9, entitled "Rules for certain rental real estate activities" with the stated purpose of "provid[ing] guidance to taxpayers engaged in certain real property trades or businesses *on applying section 469(c)(7)* to their rental real estate activities." 26 C.F.R. § 1.469-9(a) (emphasis added). Subsection 1.469-9(e)(3)(i) does not otherwise purport to prohibit real estate professionals from taking advantage of the rules set out in 26 C.F.R. § 1.469-4, allowing taxpayers to group certain activities and, specifically, allowing grouping of rental activities with other trade or business activities in certain circumstances, § 1.469-4(d)(1), "for purposes of applying the passive activity loss and credit limitation rules of section 469," § 1.469-4(a). This is especially telling given that § 1.469-4 is explicitly referenced in other subsections of § 1.469-9. *See*, *e.g.*, 26 C.F.R. § 1.469-9(b)(3) ("any rental real estate that the taxpayer grouped with a trade or business activity under § 1.469-4(d)(1)(i)(A) or (C)[4] is not an interest in rental real estate for

---

[4] With the possible exception of their golf activities, the Stanleys assert that they grouped their rental activities with other trade or business activities pursuant to § 1.469-4(d)(1)(i)(B), such that this section would not apply. This section would, then, appear to contemplate that the Stanleys could not only group their rental activities with other trade and business activities but also that the grouped "Activity" could still be considered to be an interest in rental real estate for purposes of

purposes of this section"); 26 C.F.R. § 1.469-9(d)(1) ("A taxpayer's grouping of activities under § 1.469-4 does not control the determination of the taxpayer's real property trades or businesses under this paragraph (d)").

Second, subsection 1.469-9(e)(3)(i) ends with the summary conclusion that, because a real estate professional may not group a rental real estate activity with any other activity of the taxpayer for purposes of § 1.469-9, "only the participation of the taxpayer with respect to the rental real estate may be used to determine if the taxpayer materially participates in the rental real estate activity under § 1.469-5T." The conclusion does not say that a real estate professional cannot, thus, group rental activities with any other activity for purposes of applying the passive activity loss and credit limitation rules of § 469. Rather, read in context, the subsection appears to apply to grouping for purposes of determining material participation or, perhaps, to aggregating rental activities pursuant to subsection 1.469-9(g) (which would be done, in part, to meet material participation requirements). This interpretation is further supported when the subsection is read in context with its accompanying subpart. Subsection 1.469-9(e)(3)(ii) sets out an exception to the general rule set out in subsection 1.469-9(e)(3)(i) in providing that a real estate professional may nonetheless "participate in a rental real estate activity through participation, within the meaning of §§ 1.469-5(f) and 5T(f) [setting out rules for determining material participation], in an activity involving the management of rental real estate." This subsection again directly addresses only material participation. The examples following subsection 1.469-9(e) also address determinations of whether a taxpayer materially participates in rental real estate activities. 26 C.F.R. § 1.469-9(e)(4). An attentive reading of subsection 1.469-9(e)(3)(i) leads to the conclusion that grouping of rental activities and other

---

§ 1.469-9.

activities is prohibited only for purposes of determining material participation pursuant to § 1.469-5 and 5T and not for purposes of applying the passive activity loss and credit limitation rules of 26 U.S.C. § 469.

Finally, 26 C.F.R. § 1.469-4(c)(1) explicitly allows for grouping of rental and non-rental activities in certain circumstances.  This regulation on grouping does not include any provision indicating that real estate professionals are prohibited from availing themselves of the benefits of grouping their rental real estate activities with any other activity if they otherwise meet the requirements of the grouping regulation.

Because the Court finds that the Stanleys were not categorically prohibited from grouping their aggregated Rental Activity with their other trade or business activities, the Court must analyze whether the Stanleys' grouping of their Schedule E activities was appropriate under 26 C.F.R. § 1.469-4.  Generally, "[o]ne or more trade or business activities or rental activities may be treated as a single activity if the activities constitute an appropriate economic unit for the measurement of gain or loss for purposes of section 469." 26 C.F.R. § 1.469-4(c)(1).  "[W]hether activities constitute an appropriate economic unit . . . depends upon all the relevant facts and circumstances," with the greatest weight given to the following factors: "(i) Similarities and differences in types of trades or businesses; (ii) The extent of common control; (iii) The extent of common ownership; (iv) Geographical location; and (v) Interdependencies between or among the activities."  26 C.F.R. § 1.469-4(c)(2).  "A taxpayer may use any reasonable method of applying the relevant facts and circumstances in grouping activities."  *Id*.  A rental activity, however, "may not be grouped with a trade or business activity unless the activities being grouped together constitute an appropriate economic unit . . . *and* (A) The rental activity is insubstantial in relation to the trade or business

-16-

activity; (B) The trade or business activity is insubstantial in relation to the rental activity; or (C) Each owner of the trade or business activity has the same proportionate ownership interest in the rental activity." 26 C.F.R. § 1.469-4(d)(1).

The Government argues that the IRS correctly determined that the Stanleys could not properly group all their Schedule E activities together. The Stanleys argue that their grouping was reasonable and appropriate, as the grouped Activity was an appropriate economic unit and the grouped trade or business activities were all insubstantial in relation to the aggregated Rental Activity.

The Stanleys grouped their aggregated Rental Activity with other trade or business activities, including LMC, LCI, and the activity of golf courses adjoining LMC-managed properties. Having considered the relevant facts and circumstances, the Court first finds that the Rental Activity, LMC, LCI, and the golf courses formed an appropriate economic unit. With few exceptions, the rental properties aggregated in the Stanleys' Rental Activity were all managed by LMC, with telecommunications services provided by LCI. LMC is a property-management company that manages rental apartment complexes, golf courses, and commercial properties in Arkansas and surrounding states. The parties stipulated that "[t]he vast majority of LMC's revenues came from property management fees." (Doc. 26-4, ¶ 31). LCI "provided telecommunications services . . . to some apartment complexes and golf courses managed by [LMC] or negotiated with third-party providers to provide telecommunications services to certain LMC-managed apartment complexes and golf courses." (Doc. 26-4, ¶ 25(a)). As for the golf courses, "[e]very LMC-managed golf course [is] located next to an LMC-managed apartment complex." (Doc. 26-4, ¶ 39). Some LMC apartment complexes have no adjoining golf course; some have 9-hole courses that are free for

tenants to use; and some have 18-hole courses that tenants may be able to use at a reduced rate. All courses are also open to the public for a fee.

While there are certainly significant differences in the types of services offered by the rental properties, LMC, LCI, and the golf courses, all four services worked in concert in connection with the same trade or business category—rental real estate. While the precise ownership of the various rental properties was technically diverse, it appears from the record that James E. Lindsey and/or his family exerted common control over the rental properties, LMC, LCI, and the golf courses. All the rental real estate properties as well as the golf courses were also under common control to the extent that they were all managed by LMC, which was an S corporation with a majority shareholder—Mr. Lindsey. As to the geographic location of the various activities, LMC is headquartered in Northwest Arkansas and the rental properties and golf courses it manages (and for which LCI provides services) are all concentrated in Arkansas and nearby states. Finally, the interdependencies of the rental properties with LMC and LCI and with the golf courses is apparent. As already stated, LMC and LCI were entities whose function was to perform services on behalf of LMC-managed rental properties. Those rental properties included certain complexes whose business model was to provide tenants with access—for free or at a reduced rate—to an adjoining golf course. While golf and apartment rentals are not inherently related, LMC created an apparently successful business model that linked the two, and the regulations allow for consideration of all relevant facts and circumstances—not just those factors that are specifically enumerated. Much as a fast food restaurant might attract customers via a playground area or a savings club might have an adjoining gas station or restaurant, LMC's model sought to attract tenants through golf. Roy testified that developing golf courses in conjunction with apartment rentals generally decreased neighborhood

opposition that would otherwise be encountered in response to a proposed apartment rental development on its own.  Grouping these two activities in this context represents a "reasonable method of applying the relevant facts and circumstances in grouping activities."  26 C.F.R. § 1.469-4(c)(2).

The Court also finds that LMC, LCI, and the golf activities were insubstantial in relation to the Rental Activity.  In making this determination, the Court has endeavored to consider all the "pertinent factors."  TD 8565, 1994-43 I.R.B. 4 (rejecting a bright-line rule for determining insubstantiality " to avoid complex and mechanical rules," stating that "the regulations already adopt a facts-and-circumstances test that looks at all the pertinent factors"); *Candelaria v. United States,* 518 F. Supp. 2d 852, 859-60 (W.D. Tex. 2007); *Glick v. United States*, 96 F. Supp. 2d 850 (S.D. Ind. 2000).  Because the test for insubstantiality is one that depends on the facts and circumstances of each individual case, the Court relies heavily on the evidence of record and finds that a lengthy legal analysis as to this point is unnecessary in this case.

The only business of LMC was to manage rental real estate properties, including those grouped in the Stanleys' Rental Activity; the only business of LCI was to provide telecommunications services to those rental real estate properties; and the golf courses were created incidentally to the rental real estate properties to which they are connected.  "The vast majority of LMC's revenues came from property management fees" generated by management of the rental real estate properties.  (Doc. 26-4, ¶ 31).  Roy testified that LCI was created in order to be able to market bundled telecommunication services with property rentals to increase competitiveness in the rental market as well as to create a profit that was divided with the apartment ownership entities at the end of each year.  (Doc. 59, pp. 43-44).  Finally, Roy testified that the *combined* revenues of the golf

courses, LMC, and LCI came to less than twenty percent of the total revenue for those activities and the rental properties managed by LMC,[5] satisfying an "80/20 rule" to the extent such a rule still applies,[6] and in any event demonstrating that both collectively and independently, LMC, LCI, and the golf course activities were insubstantial to the rental properties in an economic sense. The Government has challenged Roy's calculations as not fully substantiated, but even taking the revenues presented by Roy as a rough estimate, and given the practical and operational reality in which LMC, LCI, and the golf activities co-existed with the rental properties as set forth above, the Court finds that Roy has reasonably shown that he could properly group his Rental Activity with LMC, LCI and his golf activities.

While the parties initially stipulated that "Beacon Hill, Inc. cannot be grouped with Lindsey Management Company, Inc. or Lindsey Communications, Inc. under 26 C.F.R. § 1.469-4 or § 1.469-9 on [the Stanleys'] 2009 and 2010 income tax returns," (Doc. 26-5, ¶ 2) Roy represents that he later asked Government counsel to remove that stipulation (Doc. 34, p. 6). Roy states that, while he "did not participate in the day-to-day management or operation of Beacon Hill, Inc." he "believe[s] it can be properly remain [sic] a part of the group because of Plaintiffs' participation in the group as a whole." *Id*. Even if the Court were to allow Roy to withdraw his stipulation, the Court would otherwise find that the Stanleys have not adequately shown that Beacon Hill, Inc. should be grouped with their other Schedule E activities. The parties devoted little argument or analysis to this entity

---

[5] Doc. 59, p. 90.

[6] *See Candelaria*, 518 F.Supp.2d at 858-59 (noting that "Treasury Regulations do not define the term 'insubstantial' in the context of comparing rental and other business activities" and looking to other statutes and regulations before concluding that "the 80/20 Test is an appropriate representation of what constitutes 'insubstantial' with regard[] to income as the test's percentages fall within the range used in these other statutes and regulations").

or to LGC Construction Management, LLC or Lindsey-Green Commercial Properties Management, Inc.[7]  The Court cannot find that the Stanleys have met their burden of proof of showing that they are entitled to relief as to these entities and the Court finds, therefore, that the following entities/activities should not be grouped with the Stanleys' Schedule E activities on their tax returns for 2009 and 2010 and should, instead, each be considered as a separate activity, which would make any income or losses attributable to those activities passive:

- Beacon Hill, Inc.;

- LGC Construction Management, LLC; and

- Lindsey-Green Commercial Properties Management, Inc.

The Stanleys have agreed that Property Tax Services, Inc. should not be grouped with the other Schedule E activities.  (Doc. 36, p. 13).  The Stanleys have also conceded that their non-operational activities can be removed from the group as well.  *Id.*

**D.      Roy Stanley materially participated in the grouped activity.**

Generally, "any work done by an individual (without regard to the capacity in which the individual does the work) in connection with an activity in which the individual owns an interest at the time the work is done shall be treated for purposes of this section as participation of the individual in the activity."  26 C.F.R. § 1.469-5(f)(1).  As already discussed above, a real estate professional "may participate in a rental real estate activity through participation, within the meaning of §§ 1.469-5(f) and 5T(f), in an activity involving the management of rental real estate (even if the

---

[7] If the Court has missed any other entities/activities that either party believes is not properly a part of the aggregated "Rental Activity" and not appropriately grouped with the Rental Activity pursuant to subsection 1.469-4(d)(1), the parties should so inform the Court via stipulation or in their briefs on damages.

management is conducted through a separate entity)." 26 C.F.R. § 1.469-9(e)(3)(ii). "In determining whether the taxpayer materially participates in the rental real estate activity, however, work the taxpayer performs in the management activity is taken into account only to the extent it is performed in managing the taxpayer's own rental real estate interests." *Id*. Otherwise, an individual can generally show material participation in an activity for a taxable year if he meets any one of several tests set out in 26 C.F.R. § 1.469-5T(a), including through participation in the activity for more than 500 hours during a taxable year. 26. C.F.R. § 1.469-5T(a)(1). "The extent of an individual's participation in an activity may be established by any reasonable means. Contemporaneous daily time reports, logs, or similar documents are not required if the extent of such participation may be established by other reasonable means." 26 C.F.R. § 1.469-5T(f)(4).

The Court finds that the Stanleys can show material participation in their grouped Schedule E Activity. Roy had an ownership interest in a large majority of properties managed by LMC.[8] The Court finds that 26 C.F.R. § 1.469-9(e)(3)(ii) should be read to allow all work engaged in by Roy for the benefit of LMC to be counted as work performed in managing Roy's own rental real estate interests such that Roy's time at LMC should be counted towards determining whether Roy materially participated in his rental real estate activity. It would be unreasonable, in the limited scenario presented by this case of a real estate professional who works at a real estate management company and also has ownership interests in the vast majority of properties managed by the company, to delineate the time he spent on an individual property, especially where much of the work performed by Roy was done for the benefit of multiple properties or LMC generally.

---

[8] Roy admitted into evidence an exhibit purporting to show that he had an ownership interest in 86 percent of the apartment units managed by LMC. (Pl. Hearing Exh. 13).

Furthermore, subsection 1.469-9(e)(3)(ii) does not require a taxpayer to delineate or categorize work performed in a management activity, as the Government would require Roy to do (i.e. when was he acting as general counsel or as a general manager as opposed to directly "managing" properties). Rather, subsection 1.469-9(e)(3)(ii) allows a taxpayer to generally credit towards material participation all "work the taxpayer performs in the management activity" as long as it is performed in managing the taxpayer's own rental real estate interests. "Management" of rental real estate, especially on a large scale, will necessarily involve legal issues or issues of compliance, such as those on which Roy spent a significant amount of time.[9] "Management" should not be construed so narrowly so as to exclude these categories—or other categories—of services inherently necessary to the functioning of a successful real estate management entity.

Finally, the Government has cited to no authority, nor has the Court found any authority, to support the proposition that Roy's time spent managing his rental real estate interests should be discounted to reflect his actual percentage ownership interest in any given property. Rather, "any work done by an individual (without regard to the capacity in which the individual does the work) in connection with an activity in which the individual owns an interest at the time the work is done shall be treated for purposes of this section as participation of the individual in the activity." 26 C.F.R. § 1.469-5(f)(1). The regulations do not require a certain percentage of ownership in an

---

[9] The parties are largely in agreement as to how Roy Stanley spent his time at LMC. (Doc. 26 and Doc. 34). For instance, "[i]n 2009 and 2010 . . . Roy Stanley continued to have oversight over the legal issues related to LMC's operations and the development of new properties;" "was involved in legal matters related to property development and management, such as drafting and reviewing documents to obtain easements and to keep the property entities in good standing, draft and interpret leases, as well as contracts with banks;" "trained other LMC attorneys;" and "reviewed the leases of golf courses, easements related to the golf courses, and documents related to lawsuits." (Doc. 26, ¶¶ 95-97).

activity before an owner may be deemed to participate when working "in connection with [that] activity," and the Court will not read such a requirement into the regulations where it does not exist.

Because the Stanleys' rental real estate activity is grouped with other trade or business activities, and because the trade or business activities are insubstantial in relation to the rental activities, the grouped Activity takes on the nature of a rental real estate activity, for which subsection 1.469-9(e)(3)(i) does not allow consideration of participation in the non-rental activities to be credited towards determining material participation in the grouped rental Activity. The Court will not and need not, therefore, consider whether the Stanleys may have otherwise materially participated in any trade or business activity pursuant to the tests set out in 26 C.F.R. § 1.469-5T(a).

## III. Conclusion

For the reasons set forth above, the Court finds and ORDERS that Plaintiffs' motion for summary judgment (Doc. 21) should be and is GRANTED, except to the extent that the Court has found that the following entities should not be grouped on the Stanleys' Schedule E for tax years 2009 and 2010 and should, instead, each be considered to be a separate activity generating passive losses or income:

- Beacon Hill, Inc.

- LGC Construction Management, LLC

- Lindsey-Green Commercial Properties Management, Inc.[10]

- Property Tax Services, Inc.

---

[10] If the Court has missed any other entities/activities that either party believes is not properly a part of the aggregated "Rental Activity" and not appropriately grouped with the Rental Activity pursuant to subsection 1.469-4(d)(1), the parties should so inform the Court via stipulation or in their briefs on damages.

• Any non-operational activities

It is further ordered that the Government's motion for summary judgment (Doc. 24) is DENIED.

The parties are encouraged to submit a stipulation as to what damages the Stanleys are entitled to as a result of this ruling by **December 1, 2015**. If the parties are unable to agree on damages, simultaneous briefs should be filed by that same date. The stipulation or briefs should include consideration of whether the Stanleys are entitled to recover interest and costs. Judgment will be entered upon resolution of the damages issue.

IT IS SO ORDERED this 12th day of November, 2015.

*/s/ P. K. Holmes,* III
P.K. HOLMES, III
CHIEF U.S. DISTRICT JUDGE